UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JERARD HAMPTON,

                Plaintiff,

v.                                          Case No. 19-CV-688

BRIAN FOSTER, *et al.*,

                Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Jerard Hampton brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) Hampton alleges two Eighth Amendment deliberate indifference claims: that defendants failed to give him his medication in November and December 2018 and that defendants failed to protect him from self-harm in February 2019. The defendants filed a motion for summary judgment as to both claims. (ECF No. 59.) For the reasons stated below, I will grant the defendants' motion for summary judgment.

### FACTS

*The Parties*

During the relevant time period, Jerard Hampton was incarcerated at Waupun Correctional Institution. (ECF No. 73, ¶ 1.) He suffers from several psychological and physical medical conditions including major depressive disorder; generalized anxiety disorder; schizoaffective disorder, bipolar type; polysubstance abuse disorder; antisocial

personality disorder; asthma; gastroesophageal reflux disease; and chronic headaches. (ECF No. 74, ¶ 1.)

The defendants were all employed at Waupun during the relevant time period. (ECF No. 73, ¶ 1.) Jacob Dorn and Joseph Beahm were Sergeants; Elaine Anderson was a nurse; Cathy Jess was the DOC secretary; Brian Foster was the Warden; Kyle Tritt was a Captain; and Jesse Jones was a correctional officer. (*Id.*)

Hampton was allowed to proceed on an Eighth Amendment deliberate indifference claim against Dorn, Anderson, Jess, Foster, and Tritt for failing to ensure he received his medication between November and December 2018. Hampton was also allowed to proceed on an Eighth Amendment claim against Beahm and Jones for failing to prevent him from inserting a pen-insert into his penis.

*Facts Related to Failure to Receive Medication*

Due to his various medical conditions, Hampton has been prescribed several medications including Diphenhydramine (antihistamine); Acetaminophen (commonly known as Tylenol); Hydrochlorothiazide (a diuretic); and sodium chloride nasal spray. (ECF No. 74, ¶ 3.) While none of these are medications that treat mental health issues, Hampton states that if he does not regularly receive these medications "even for a short period of time, I suffer from anxiety, suicidal thoughts/thoughts of self-harm, auditory and visual hallucinations (including hallucinations that cause ideations of suicide/self-harm), migraines, severe acid reflux, shortness of breath, and difficulty breathing." (*Id.*, ¶ 4.)

Hampton had been regularly taking these medications prior to being transferred to the Restricted Housing Unit (RHU) on November 21, 2018. (*Id.*, ¶ 5.) These medications are "keep on person" in general population, meaning that Hampton could keep them with

2

him in his cell and take as needed. (ECF No. 73, ¶ 9; ECF No. 74, ¶ 6.) Once in RHU, Hampton was no longer allowed to keep the medications with him in his cell. (ECF No. 74, ¶ 6.) Instead, RHU staff distributed the medications at various times throughout the day; this was known as "medication pass." (ECF No. 73, ¶ 3.)

When it was time for medication pass, RHU staff played "a loud, three-to-four second tone, followed by an announcement over the intercom system." (*Id.*) To receive medication, inmates were required to be at their cell doors with their lights on. (*Id.*, ¶ 4.) If an inmate was not at their cell door, Sgt. Dorn, who was one of the RHU staff members who passed out medication, "would knock loudly on the door and call for the inmate." (*Id.*) Inmates could refuse medication either by verbally informing Dorn they did not want it or implicitly by staying in bed and not coming to their cell door. (*Id.*, ¶ 6.) When inmates refused medication, Dorn would mark the medication as refused in the log.

Hampton states that between November 21, 2018 and December 5, 2018, his medications were unavailable to him. (ECF No. 74, ¶ 7.) He alleges that RHU staff would indicate in the logs that he refused medication when in reality, they did not have his medication. (*Id.*) Hampton states he notified Nurse Anderson and Dorn that he was not receiving all of his medication, though he does not provide details on when and how he notified them. (*Id.*, ¶ 8.) Hampton also states he notified Jess, Foster, and Tritt, but again does not provide details of when and how he notified them. (*Id.*, ¶ 9.) At most he states that "[t]hese notifications were made while I was still being denied my medications." (*Id.*, ¶ 10.) Hampton also filed an inmate complaint regarding his medications while in RHU and notes that an investigation showed that not all of his medications were available. (*Id.*, ¶¶ 14–15.) A review of the inmate complaint shows that it was discovered that Hampton's inhalers

3

were unavailable on December 2, 2018, but HSU staff immediately rectified the situation. (ECF No. 75-3 at 2.)

The defendants state that Hampton refused medications several times between November 21 and December 5, 2018. (ECF No. 73, ¶ 2.) The records indicate that Dorn recorded that Hampton refused ten medications on November 22 and 23, 2018. (ECF No. 70-1 at 68, 71–72.) The defendants further assert that Hampton's medications were generally available during the relevant time period. The defendants note that the records show Hampton's medications were available to him in the RHU because Hampton took them at least once between November 23 and November 30, 2018. (*Id.* at 46, 58, 60, 61, 64, 67–68.) The records also indicate that Hampton refused his inhaler and topical cream several times while accepting other medications, and that he accepted his inhaler on December 3, 2018. (*Id.* at 25, 27–28, 32–33.) Dorn states that he never marked any of Hampton's medications as refused when in fact they were unavailable. (ECF No. 73, ¶ 8.)

It is undisputed that Hampton wrote a Health Services Request ("HSR") on November 22, 2018 that stated, "I don't have any of my meds that I keep in cell over here or my medical special need things. Can this get cleared up as soon as possible. I don't know the names of my meds by hard [*sic*]." (ECF No. 70-1 at 75.) Nurse Anderson responded to this HSR by personally confirming that his medications were on the RHU cart used for distribution. (ECF No. 73, ¶ 9.) Nurse Anderson states this is the only time she was made aware of an issue with Hampton's medication. (*Id.*, ¶ 10.) Hampton asserts that he told her "repeatedly" that he did not receive his medication, but does not provide details, such as when and how he told her about the issue. (*Id.*)

4

It is also undisputed that Hampton wrote another HSR on December 2, 2018, wherein he stated that he did not receive his inhalers for nine days, and during that nine-day period, he experienced breathing problems. (ECF No. 70-1 at 74.) HSU staff responded that Hampton would be seen by HSU to discuss the issue. (ECF No. 73, ¶ 11.) It is undisputed that Hampton was then seen by HSU staff on December 2, 3, 4, 5, and 7, 2018. (*Id.*, ¶ 12.) The response to Hampton's inmate complaint also demonstrates he promptly received his inhaler after he notified HSU it was unavailable. (ECF No. 75-3 at 2.)

Additionally, there is no dispute that between December 4 and December 5, 2018, Hampton wrote notes addressed to Warden Foster about not receiving his medication. (*Id.*, ¶ 14.) Warden Foster, however, did not respond to these notes, but instead Corrections Program Supervisor Ryan Kuepper (not a defendant) received these notes and attempted to resolve the issue. (*Id.*) It is also undisputed that Foster was not involved in reviewing Hampton's inmate complaint about the issue (WCI-2018-26334), because Foster is not the reviewing authority on inmate medical complaints. (*Id.*, ¶ 15.)

*Facts Related to Self-Harm*

On February 12, 2019, Hampton was placed on observation status after he told unnamed Waupun staff that he was hearing voices instructing him to harm himself. (ECF No. 74, ¶ 18.) Between February 12 and February 15, 2019, Hampton asserts that he told Sgt. Beahm and CO Jones that he was hearing voices and intending to harm himself, though Hampton does not provide details on when and how he informed Beahm and Jones about this. (*Id.*, ¶ 21.) Hampton states he does not recall telling anyone he denied any intent to harm himself. (*Id.*)

On February 15, 2019, Hampton attempted to get the attention of observation unit staff in various ways including covering up his cell's video camera, calling for assistance over the intercom, and verbally informing several officers including Beahm and Jones that he was going to harm himself. (*Id.*, ¶ 22.) He states no one responded to his calls. (*Id.*, ¶ 23.) At some point, Hampton found a pen-insert in his cell and inserted it into his penis. (*Id.*, ¶ 24.) Hampton then told Officer Kasuboski what he had done. (ECF No. 73, ¶ 21.) The lasting effects of this injury include blood in his urine and semen and chronic testicular pain. (ECF No. 74, ¶ 25.)

The defendants do not dispute that Hampton was feeling suicidal because that was the very reason he was placed on observation status. (ECF No. 78, ¶ 18.) The defendants state that neither Beahm nor Jones had any indication that Hampton was going to harm himself with a pen-insert. (ECF No. 73, ¶¶ 19, 20.) Non-defendant COs Strunz and Smith were monitoring the intercom on February 15, 2019. (*Id.*, ¶ 18.) Jones was tasked with checking on the inmates in observation status every 15 minutes and states he was not aware that Hampton had harmed himself until Kasuboski was alerted to the harm, which happened between 15-minute checks. (*Id.*, ¶ 21.) The defendants also note the observation unit logs show that Hampton was regularly checked on by psychological unit staff between February 12 and February 15, 2019, and he indicated to them several times that he was not going to harm himself. (ECF No. 68-1 at 48–49, 51.) Hampton also met with psychological staff on for an hour and half on February 15—between 8:30 and 10:00 a.m.—where he denied harming himself. (*Id.* at 51.) He then harmed himself 75 minutes after talking with psychological staff. (ECF No. 77 at 4.) Beahm and Jones also assert that even if Hampton

had alerted them that he was about to harm himself, the appropriate action would be to engage psychological services. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

7

## ANALYSIS

1. *Deliberate Indifference to Medical Needs Claim*

Hampton claims that defendants Dorn, Anderson, Jess, Foster, and Tritt violated his Eighth Amendment rights when they were deliberately indifferent to his medical needs by ignoring his requests to make his various medications available. A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Hampton states that when he does not regularly receive his medication, he suffers from anxiety, suicidal tendencies, migraines, severe acid reflux, and difficulty breathing. Not receiving his medication, then, caused "pain and suffering which no one suggests would serve any penological purpose." *Gutierrez v. Peters*, 111 F.3d, 1364, 1371 (7th Cir. 1997) (quoting *Estelle,* 429 U.S. at 103). Hampton has established that he suffers from an objectively serious medical condition.

8

As to whether the defendants were deliberately indifferent, a plaintiff must show "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). "For a prison official's act or omissions to constitute deliberate indifference, a plaintiff does not need to show that the official intended harm or believed that harm would occur. But showing mere negligence is not enough." *Id.* "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Id.* (emphasis in original). Accordingly, "officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." *Id.*

Hampton does not establish that there is a genuine issue of material fact that Dorn and Anderson actually knew of and disregarded a substantial risk of harm. Taking the facts in a light most favorable to Hampton, he asserts that his medications were unavailable, but he provides no indication as to how he knew that. He also states that he notified Anderson and Dorn several times that he was missing his medication. However, he provides no details in support of his assertion. He does not provide evidence of what dates he spoke to Anderson and Dorn or whether he verbally informed them at medication pass or informed them in writing. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not be entered.'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)).

9

Contrary to Hampton's assertion, the evidence on the record indicates that Hampton's medications were available. The HSU records show that Hampton received most of his medications at least once between November and December 2018. The records also show that Hampton refused his medications on several occasions when Dorn attempted to administer them. The most Hampton offers to rebut this evidence is that he does not recall refusing medications or receiving medications and an implication that perhaps Dorn marked medications as refused when they were actually unavailable. This is not enough. Bald assertions that are not bolstered by more specific evidence are insufficient to create a genuine issue of material fact. *Drake v. Minn Mining & Mfg Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

The record does include Hampton's inmate complaint and his two HSRs, but these do not support his overall argument that his medications were generally unavailable, and that Dorn and Anderson knew that they were unavailable yet did nothing. The first HSR written on November 22, 2018 is the only substantive evidence on the record of Anderson's involvement in the events in question. The HSR itself demonstrates that Anderson immediately responded to Hampton's concern of unavailable medication by confirming that his medications were available. If she somehow missed the unavailability of Hampton's inhaler, then that would amount to negligence at best.

The second HSR written on December 2, 2018 and the inmate complaint concerning the handling of that HSR do not involve either Dorn or Anderson. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v.*

10

*Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Because § 1983 makes public employees liable "for their own misdeeds but not for anyone else's," *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009), a plaintiff must specifically allege what each individual defendant did (or did not do) to violate his constitutional rights. The second HSR and the inmate complaint, then, cannot be used as evidence to show that Anderson and Dorn were deliberately indifferent because there is nothing in the record to suggest that they knew about the missing inhaler that is the subject of the HSR and inmate complaint.

Thus, no reasonable jury could conclude that Anderson or Dorn deliberately disregarded the fact that Hampton's medications were unavailable to him. Hampton does not establish that the evidence demonstrates that he informed Dorn he was not receiving his medication. And while there is some evidence that Anderson was aware he had concerns about unavailable medications, the evidence shows she immediately investigated and addressed Hampton's concerns. Accordingly, summary judgment is granted in Dorn and Anderson's favor on this claim.

As to Jess, Tritt, and Foster, Hampton appears to claim that they should be liable as supervisors and overseers of the RHU and Waupun generally. Supervisors can be held liable for constitutional violations caused by their employees where the violation happens at the supervisor's direction or with the supervisor's knowledge and consent. *Hildebrant*, 347 F.3d at 1039. In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* As established above, there was no constitutional violation, so these defendants cannot be held liable under a theory of supervisor liability.

11

However, even if there was a constitutional violation, Hampton fails to establish that Jess, Tritt, and Foster were aware that his medication was unavailable to him. Hampton states he notified Jess and Tritt, but he again fails to provide any details as to when and how he notified them. As explained above, this is insufficient to demonstrate a genuine issue of material fact. Summary judgment is granted in their favor.

As to Foster, Hampton does provide evidence that he wrote Foster informing him of the situation, but it is undisputed that Foster did not handle those notes. Instead, Ryan Kuepper received the notes, and he addressed the issue. So, the evidence of the notes fails to establish that Foster was aware of the issue. And, to the extent Hampton argues that Foster was also aware of the situation through his role in the inmate complaint system, it is undisputed that Foster was not the reviewing authority for medical-related complaints. Additionally, even if he had been, prison officials who deny grievances "but who otherwise did not cause or participate in the underlying conduct" cannot be held liable under § 1983. *See Owens v. Hinsley,* 635 F.3d 950, 953 (7th Cir. 2011) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)). Summary judgment is granted in Foster's favor as well.

   2. *Failure to Prevent Self-Harm Claim*

Hampton claims that Sgt. Beahm and CO Jones violated his Eighth Amendment rights when they failed to prevent him from inserting a pen-insert into his penis on February 15, 2019. Under the Eighth Amendment, prison officials have an obligation to make sure that they take "reasonable measures" to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). This includes protecting inmates from self-harm as "the obligation to intervene covers self-destructive behaviors up to and including suicide." *Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). A failure to intervene claim in

this context "has both an objective and a subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to the prisoner's health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). "When a claim is based upon the failure to prevent harm, in order to satisfy the first element, the plaintiff must show that the inmate was 'incarcerated under conditions imposing a substantial risk of serious harm.'" *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (quoting *Farmer*, 511 U.S at 832). It is undisputed that putting a pen-insert into a penis is a serious harm.

The second element requires the plaintiff to establish that the defendants subjectively knew the inmate was at a substantial risk of harming himself, and they intentionally disregarded that risk. *Collins*, 462 F.3d at 761. For "the first showing, 'it is not enough that there was a danger of which a prison official *should have been* aware,' rather 'the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)) (emphasis in original). In other words, the defendants must have been subjectively aware that a "risk of future harm [was] 'sure or very likely' to give rise to "sufficiently imminent dangers" before an official can be held liable for ignoring that risk." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion)). For the second showing, the plaintiff must show that the prison official "failed to take reasonable steps to prevent the inmate from performing the act." *Pittman ex rel. Hamilton v. Cty of Madison, Ill.*, 746 F.3d 766, 775–76 (7th Cir. 2014).

13

Case 2:19-cv-00688-NJ   Filed 11/10/21   Page 13 of 16   Document 81

As with the medication claim above, Hampton fails to provide enough evidence that would convince a trier of fact to accept his version of the events—that Beahm and Jones actually knew that he was going to imminently hurt himself with a pen-insert. Hampton states that he made several attempts to get attention on February 15, 2019, but he does not demonstrate that any specific attempts were directed to Beahm or Jones. He does not, for instance, provide any information about specific times he talked to Beahm or Jones or what exactly he told them. The only evidence he provides is his bald and vague assertion that he told them he was hearing voices and was going to harm himself, which, as stated above, is not enough. Thus, Hampton fails to establish that Beahm and Jones had subjective knowledge of an imminent danger.

Even if Hampton's statement that he told Beahm and Jones he was going to self-harm was sufficient to establish actual knowledge, the evidence in the record demonstrates that reasonable steps were taking to prevent his self-harm. According to the observation unit records, Hampton was regularly meeting with psychological staff. And security staff, including CO Jones, were checking on him every fifteen minutes. It is unfortunate that someone left a pen-insert in Hampton's cell and that Hampton used it to harm himself. However, for the reasons discussed above, Hampton has not shown that a genuine issue of material fact exists as to this claim to defeat summary judgment. As such, summary judgment is granted in Beahm's and Jones' favor.

## CONCLUSION

For both Eighth Amendment claims, Hampton fails to provide enough evidence that would convince a trier of fact to accept his version of the events. Regarding Anderson and Dorn, Hampton did not demonstrate that they actually knew and then deliberately

disregarded the fact that his medication was unavailable. Regarding Jess, Tritt, and Foster, Hampton did not establish that he notified them of the situation. Regarding Beahm and Jones, Hampton did not show that they were actually aware that he was imminently going to insert a pen-insert into his penis. Accordingly, summary judgment is granted in favor of all defendants. The defendants also argued that they were entitled to qualified immunity. Because I have granted summary judgment on the merits, I need not address the qualified immunity argument.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** the defendants' motion for summary judgment (ECF No. 59) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of

Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case

Dated at Milwaukee, Wisconsin this 10th day of November, 2021.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge